# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Mar 14, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

|   |   |   |
|---|---|---|
| In the Matter of the Search of | ) | |
| (1) Samsung SM-A156U telephone with clear case, IMEI: | ) | Case No. |
| 359606631233674; (2) Samsung SM-A146U telephone with | ) | |
| black case, IMEI: 359136791172082; (3) Samsung SM-A125U | ) | |
| telephone, with red case, IMEI: 350593474066784; and (4) | ) | |
| Samsung SM-6531H telephone with orange case, IMEI: | ) | |
| 352552/07/274153/5, CURRENTLY LOCATED AT FBI | ) | |
| Sacramento Office Evidence Room, Roseville, California | | |

Case No. **2:25-sw-0235 JDP**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *Code Section* | *Offense Description* |
| **21 U.S.C. § 841(a)(1)** | **Distribution of Cocaine** |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Preston Patton
*Applicant's signature*

Preston Patton, Special Agent, FBI
*Printed name and title*

Sworn to me and signed via telephone.

Date:  __March 14, 2025__

_____
*Judge's signature*

City and state:  __Sacramento, California__

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

MICHELE BECKWITH
Acting United States Attorney
JAMES R. CONOLLY
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of: | CASE NO. |
| --- | --- |
| (1) Samsung SM-A156U telephone with clear case, IMEI: 359606631233674; (2) Samsung SM-A146U telephone with black case, IMEI: 359136791172082; (3) Samsung SM-A125U telephone, with red case, IMEI: 350593474066784; and (4) Samsung SM-6531H telephone with orange case, IMEI: 352552/07/274153/5 CURRENTLY LOCATED AT FBI Sacramento Office Evidence Room, Roseville, California | AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH ELECTRONIC DEVICES |

I, Preston Patton, Special Agent with the Federal Bureau of Investigation, having been duly sworn, hereby depose and state:

## I.    AGENT BACKGROUND AND EXPERIENCE

1.    I am a Special Agent with the FBI, and have been since July 2014.

2.    Since March 2020, I have been assigned to the South Lake Tahoe Resident Agency (RA) of the Sacramento Division of the FBI.  Prior to my employment in the FBI, I earned a commission in the U.S. Army from West Point and led soldiers as a Ranger qualified Infantry officer for six years.

3.    While employed by the FBI, I have investigated federal criminal violations related to transnational organized crime, domestic terrorism, counter-intelligence, violent gangs, and child exploitation.

AFFIDAVIT                                           1

4.      During my training, I received instruction in Title 21 of the United States Code, including, but not limited to Sections 841(a). I have also received instruction in Title 8 of the U.S. Code, including but not limited to Section 1326.  In the course of my employment, I have participated in a number of investigations involving the use of federal and state warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, firearms, and other types of evidence that document the activities of criminal organization in both the manufacturing and distribution of controlled substances and weapons.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, and I am authorized by the Attorney General to request a search warrant.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) have been committed by **Roberto Rojas Isidro Guzman**.

8.      This Affidavit is made to support an application to search cellular telephones associated with **Guzman.**

9.      I am familiar with the facts and circumstances of the investigation through my role as case agent. I am familiar with the circumstances surrounding **Guzman's** arrest based participation this arrest and my conversations with investigators who later conducted a federal search warrant at his property.

10.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## II.      IDENTIFICATION OF THE DEVICES TO BE EXAMINED

11.     The property to be searched are the following four telephones (the "**Devices**"):

(1) Samsung SM-A156U telephone with clear case, IMEI: 359606631233674; (2) Samsung SM-A146U telephone with black case, IMEI: 359136791172082; (3) Samsung SM-A125U telephone, with red case, IMEI: 350593474066784; and (4) Samsung SM-6531H telephone with orange case, IMEI: 352552/07/274153/5;

The **Devices** are currently located at FBI Sacramento Office Evidence Room, Roseville, California.

12.    The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

### III.    PROBABLE CAUSE

### A.    Roberto Rojas Isidro Guzman Identified as a Drug Dealer in South Lake Tahoe

13.    In December 2023, an anonymous complainant called the FBI National Threat Operations Center (NTOC) to report an individual selling drugs in the Ski Run Boulevard area of South Lake Tahoe, California.  The complainant said the man used telephone number 530-545-0048 (Target Cell Phone-1).

14.    In January 2024, an individual ("CHS-1") reported to a local law enforcement officer that a local drug dealer had sold cocaine to the individual's family member, from which the family member suffered a fatal overdose.[1]  CHS-1 provided a hand drawn map of the location of the dealer's residence on Terry Lane, South Lake Tahoe.  Terry Lane is a dead-end street that turns off Ski Run Boulevard.

15.    On February 13, 2024, South Lake Tahoe Police Department (SLTPD) received an anonymous tip, via their Crime Tips email address, stating that a man known by the monikers "El Viejon" and "El Oaxaco" was selling cocaine and possibly heroin at local restaurants in South Lake Tahoe, in the Ski Run Boulevard area.  The tipster identified El Viejon's telephone number as 530-545-0048. The tipster also provided a photograph of "El Viejon" sitting at what appeared to be a bar.

---

[1] At the time of the initial report, CHS-1 was not yet an FBI informant, and was simply a individual reporting a crime.  CHS-1 was willing to work as an FBI informant because of an overdose death in CHS-1's family for which CHS-1 alleged Guzman was responsible. In order to protect the CHS's identity, further information about this overdose death which occurred several years prior, was not included in this affidavit.  CHS-1 later received financial compensation for CHS-1's efforts in assisting law enforcement.  Investigators corroborated the information CHS-1 provided during this investigation through law enforcement databases checks, surveillance, reporting from an anonymous complainant, and reporting from a different CHS.  CHS-1's criminal history includes a misdemeanor conviction for domestic violence.)

16.     On February 26, 2024, CHS-1 identified a booking

photograph of **Roberto Rojas Isidro Guzman** as the cocaine and

fentanyl dealer on Terry Lane.  CHS-1 also identified **Guzman's**

address as **3605 Terry Lane, Unit 8, South Lake Tahoe, California**

(the **Target Residence**). CHS-1 detailed how **Guzman** had

completed a lengthy prison term and had been deported to Mexico.



CHS-1 reported that **Guzman** had returned to the Tahoe bi-state area

despite his deportation and that **Guzman** had multiple pending arrest

warrants. CHS-1 reported that **Guzman** traveled to San Diego

routinely to pickup cocaine and fentanyl from Sinaloa Cartel members.  According to CHS-1, in the

months before this report, **Guzman** had been in possession of kilogram quantities of cocaine and

fentanyl at the **Target Residence**.

17.     An open-source query revealed an archived news article from the "Lake Tahoe News"

from February 2, 2011, covering an investigation and arrest of **Guzman** in El Dorado County.  The

article detailed how investigators had conducted surveillance on **Guzman** while he made cocaine

deliveries to a "gamut of residents from moms to construction workers to the seedier element of town,"

in South Lake Tahoe.  The article quoted the leader of the investigators as saying that **Guzman** "had

established a little network…with no shortage of people waiting to buy from him."  The investigator

added that, "The amount of cocaine was significant.  He [**Guzman**] probably just got a kilo [of cocaine]

and was down to 10 ounces or so.  He had broken it in grams, eight balls and ounces."



18.     A check of **Guzman**'s criminal history showed the following arrests and convictions:

a)     1990: Arrested - illegal entry by USIS Sacramento; returned to Mexico (8 U.S.C § 1325)

b)     1993:  Arrested - illegal entry by Border Patrol; returned to Mexico (8 U.S.C § 1325)

c)      1994: Plead guilty to Sale of a Controlled Substance (Felony – Nevada Statute NRS 453.321) and Conspiracy to Violate Uniform Controlled Substances Act (Felony – NRS 453.401) for which **Guzman** was sentenced to Nevada State Prison.

d)      March 1997: Arrested for Possession of Controlled Substance for Sale (Felony – HS 11350); Convicted May 1997; Sentenced to 18 months' probation and 150 days jail.

e)      June 20, 1997: Processed by USIS Border Patrol for Illegal Entry (8 U.S.C § 1325)

f)      January 2011: Arrested for Possession of a Controlled Substance for Sale (Felony – HS 11350); Convicted and received a four-year prison sentence.

g)      December 2012: Removed from the U.S. under Alien Inadmissibility under Section 212

h)      January 2013: No bail, full extradition warrant issued for obstructing a court order (#S13CJR0003) by El Dorado County Sheriff's Office.

i)      February 2019:  Removed from the U.S. under Alien Inadmissibility under Section 212

19.      In April 2024, CHS-1 reported that **Guzman** had large amounts of cash to send to Mexico. CHS-1 also reported that **Guzman** was picking up narcotics in Santa Rosa, California.

20.      In late April 2024, a second individual ("CHS-2")[2] reported that an individual living on Terry Lane was dealing cocaine.  CHS-2 reported that this individual sold narcotics near the Whole Foods supermarket, which is near the termination of Ski Run Boulevard.

---

[2] CHS-2 initially cooperated because CHS-2 was concerned about the effects cocaine had on the lives of people in CHS-2's community.  CHS-2 also received financial compensation for CHS-2's efforts to assist law enforcement.  Investigators corroborated the information CHS-2 provided through law enforcement databases checks, surveillance, and reports from an anonymous complainant and another CHS.  CHS-2's criminal history includes a 2010 misdemeanor reckless driving conviction and a violation of a court order to prevent domestic violence.

21. On May 2, 2024, CHS-2 identified the cocaine dealer on Terry Lane as **Roberto Rojas Isidro Guzman** and reported that **Guzman** used the telephone number 530-545-0048. CHS-2 also reported that **Guzman** communicated with others using an end-to-end encrypted communication application on the phone, on which all messages would disappear after 24 hours. CHS-2 provided a



picture of **Guzman**'s identification. (See photograph, inset.) CHS-2 later reported that **Guzman** used a number of monikers which included "El Oaxaco" and "El Viejon." CHS-2 reported that **Guzman** had been involved in a kilogram level cocaine distribution network 20 years earlier, but that network dissolved after law enforcement arrested and deported some of its members.

**B.    Controlled Drug Buys**

22. On May 9, 2024, at FBI direction, CHS-1 set up and executed a controlled drug buy with one of **Guzman**'s sub-distributors.[3] CHS-1 first contacted **Guzman** directly. **Guzman** told CHS-1 not to come to his residence on Terry Lane for the deal. CHS-1 then contacted one of **Guzman**'s sub distributors and bought from him approximately 10.8 grams of suspected fentanyl. When investigators later field tested the substance, it returned a result of positive for methamphetamine.

---

[3] For each controlled purchase described in this affidavit, the CHSs acted at the direction of law enforcement agents/officers. Immediately before each controlled buy, the CHS met with investigators who searched the CHS for unexplained contraband and weapons, each time finding none. They then equipped the CHS with one or more covert audio/video recording/transmitting devices and funds for the purchase. After briefing the CHS about the transaction, the CHS then went to the transaction location, under FBI surveillance. On completion of each transaction, the CHS returned to a pre-determined location, again under surveillance, to meet with investigators, who retrieved from the CHS any contraband acquired during the purchase as well as recording/transmitting devices. Agents then searched the CHS again for any unexplained contraband and weapons, each time finding none. On some occasions, surveillance agents continued to monitor the subjects following the controlled buy.

23.     On May 23, 2024, CHS-2 completed a controlled drug deal with **Guzman** for approximately 20.3 grams of cocaine.  During this buy, CHS-2's covert audio/video recording and transmitting device captured an image of **Guzman**'s face. (See photograph, below.)  Surveillance agents also captured photographs of **Guzman** during the deal.  Initially, **Guzman** agreed to meet CHS-2 at the **Target Residence** but, just before the deal, **Guzman** told CHS-2 to meet him in a different location.  Shortly before the controlled buy was supposed to happen, investigators photographed **Guzman** completing what appeared to be a separate hand-to-hand drug deal with a different individual. Following that deal, **Guzman** then met with CHS-2 and sold CHS-2 the agreed quantity of cocaine.



24.     After completing the cocaine sale to CHS-2, **Guzman** offered to take CHS-2 back to the **Target Residence** for more narcotics.  CHS-2 declined.  **Guzman** then asked CHS-2 for a ride to a different location, where it appeared that **Guzman** completed a third drug sale.

25.     In November 2024, CHS-2 reported that **Guzman** was still selling cocaine, specifically at restaurants and at tattoo parties.

26.     Recently, CHS-2 reported that **Guzman** was still selling cocaine and living at the **Target Residence**.  It is CHS-2's understanding that **Guzman** sends large amounts of money back to Mexico.

27.     In February 26, 2025, CHS-2 completed another controlled buy with **Guzman** for approximately 7 grams of cocaine.  For this purchase, CHS-2 spoke with **Guzman** directly, this time using telephone number 530-318-6796 (Target Cell Phone-2), to coordinate the deal.  **Guzman**

1  indicated the cocaine would cost CHS-2 $600.  **Guzman** directed CHS-2 to meet with one of **Guzman**'s

2  runners, explaining when and where CHS-2 should meet the runner.  **Guzman** did not give CHS-2 a

3  telephone number for **Guzman**'s runner.  At the agreed time and location, CHS-2 met the runner, who

4  handed CHS-2 the requested cocaine in exchange for payment.

5       28.    Following the controlled purchase, CHS-2 drove with investigators to the neighborhood

6  where **Guzman** lived, where CHS-2 pointed out the **Target Residence** and identified **Guzman**'s

7  specific residence's door, **Unit 8**.  CHS-2 told investigators that **Guzman** kept his narcotics supply in a

8  vacuum sealed bag hidden just outside the residence or under the floor.  CHS-2 also reported that

9  **Guzman** had acquired two additional telephones because one of **Guzman**'s associates had recently been

10 arrested and **Guzman** was attempting to avoid law enforcement detection.

11      29.    On March 7, 2025, U.S. Magistrate Judge Delaney of the Eastern District of California

12 signed a search warrant for GPS locational data for **Target Cell Phone -1** (2:25-sw-0215 CKD) and

13 **Target Cell Phone–2** (2:25-sw-0216 CKD). U.S. Magistrate Judge Delaney also signed a federal arrest

14 warrant (2:25-mj-0048 CKD) for **Guzman** for his violation of 8 U.S.C. § 1326(a) and (b)(1).

15      30.    The FBI started receiving GPS target location data on March 8, 2025 in the afternoon.

16 The GPS data from both **Target Cell Phones** showed that **Guzman** remained in the corridor of South

17 Lake Tahoe casinos for most of the night and into Sunday morning, March 9, 2025.  Between 2-3 p.m.,

18 GPS data from both **Target Cell Phones** appeared to show that **Guzman** had returned to the **Target**

19 **Residence**.  Eventually both **Target Cell Phones** appeared to travel to the Heavenly Village tourist and

20 restaurant area.  Between approximately 4 a.m. and 6:25 a.m., GPS locational data showed that **Target**

21 **Cell Phone-2** was in vicinity of the **Target Residence** with an error radius of approximately 46 meters,

22 where it remained until approximately 4:40 p.m.

23      **C.    Arrest of Guzman and Search of Target Residence**

24      31.    On March 11, 2025, at approximately 2:40 a.m., **Target Cell Phone-2**'s location data

25 showed that it was in or near the **Target Residence,** with a margin of error of 52 meters.

26      32.    At approximately 6:00 a.m., on March 11, investigators and officers from the FBI, DHS,

27 and DEA executed a federal arrest warrant for **Guzman** (2:25-mj-0048 CKD) at the **Target Residence**.

28 Investigators initiated the arrest by activating the red and blue lights and sounding the siren from an FBI

vehicle parked approximately six feet away from the **Target Residence's** front door. Investigators, dressed in uniforms with with clear law enforcement markings, then identified themselves and the purpose of their warrant loudly. They gave **Guzman** commands in both English and Spanish to come out of the residence, but he did not. After approximately 30 seconds of lights, sirens, and loud verbal commands, agents (including myself) breached the front door. As the door swung open, I saw **Guzman** sitting fully clothed on the bathroom toilet. I gave **Guzman** commands in both English and Spanish to come to the door with his hands up. Before he did so, I watched him reach behind his back and drop an unknown object in the bowl of the toilet. Only after dropping this object did **Guzman** comply with my commands. My FBI-issued body camera captured **Guzman** sitting on the toilet and looking at investigators as we entered. (See photograph below.)





33.   My camera captured **Guzman** dropping the object in the toilet, reaching behind his back with a slightly raised elbow. (See photograph, inset.)

34.   After removing **Guzman** from the house and detaining him, investigators did a protective sweep



of the **Target Residence** to ensure the safety of the surrounding neighbors and investigators.[4]  During the sweep, which included looking behind the shower curtain of the bathroom as a potential hiding place, I saw in the open toilet what appeared to be a plastic bag containing cocaine, floating in the water of the toilet bowl. To prevent the destruction of the potential evidence while the house remained frozen as agents awaited authorization of a search warrant, I removed the bag of suspected cocaine from the toilet and placed it on the floor, next to the toilet.  This action was witnessed by another investigator.

35.    At approximately 8:14 a.m., U.S. Magistrate Judge Peterson signed a search warrant, authorizing a search of the **Target Residence**. (Case No. 2:25-sw-220 JDP.)  Investigators executed the search warrant.  In the residence, they immediately secured the bag of suspected cocaine.  They also found and seized four mobile telephones (the **Devices**). Investigators also found a small amount of U.S. currency, which was not seized.

36.    After completing the search, investigators immediately transported the telephones and suspected cocaine to the Sacramento FBI evidence control room, where they were booked into evidence. The booking agents determined that the suspected cocaine weighed over 60 gross grams, in its packaging.  Based on the investigators' training and experience, the substance was consistent with cocaine in appearance and texture.  One of the transporting agents noted that one of the telephones seized from the **Target Residence** went off several times during the search and another one of the phones appeared to be in use by **Guzman** at the time of his arrest, because a text message was currently open on the telephone.

---

[4] The protective sweep—which involves a swift search in all rooms and spaces, such as closets, curtained showers, or behind doors, in which a person could hide possibly to ambush law enforcement agents—was also necessary because **Target Residence** was a single room, shed style building constructed of wood which afforded investigators and neighboring civilian residences little to no ballistic cover in the event of gunshots.

37.    Based on the above factors, it is believed that the four telephones seized from the **Target Residence** were in use by **Guzman** and may contain evidence of his violation of 21 U.S.C. § 841(a)(1).

38.    The **Devices** are currently in storage at the FBI Sacramento Office Evidence Room, Roseville, California.  In my training and experience, I know that the **Devices**, identified in Attachment A, are stored in a manner in which the contents of the **Devices** are, to the extent material to this investigation, in substantially the same state as when the **Devices** first came into the possession of law enforcement on March 11, 2025.

## IV.    TECHNICAL TERMS

39.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless **Devices** used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the **Devices**.

b.    GPS:  A GPS navigation **Devices** uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation **Devices**s can give a user driving or walking directions to another location.  These **Devices**s can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting

the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

c.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

d.      Internet: The Internet is a global network of computers and other electronic **Devices** that communicate with each other.  Due to the structure of the Internet, connections between **Devices** on the Internet often cross state and international borders, even when the **Devices** communicate with each other are in the same state.

40.      Based on my training, experience, and research, I know that all four of the **Devices** have capabilities that allow them to serve as mobile telephones, digital cameras, portable media players, GPS, and internet browsers.  In my training and experience, examining data stored on **Devices** of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the **Devices**.

## V.      <u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>

41.      Based on my knowledge, training, and experience, I know that **Devices** can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period on the **Devices**.  This information can sometimes be recovered with forensics tools.

42.      <u>Forensic evidence.</u>  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the

crimes described on the warrant, but also forensic evidence that establishes how the **Devices** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Devices** because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device was used, the purpose of its use, who used it, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43.     <u>Nature of examination.</u>  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Devices** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Devices** to human inspection to determine whether it is evidence described by the warrant.

44.     <u>Manner of execution.</u>  Because this warrant seeks only permission to examine electronic

1  devices that are already in law enforcement's possession, the execution of this warrant does not involve

2  the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to

3  authorize execution of the warrant at any time in the day or night.

4                              **VI.       CONCLUSION**

5          45.     I submit that this affidavit supports probable cause for a search warrant authorizing the

6  examination of the **Devices**, described in Attachment A, to seek the items described in Attachment B.

8                                              Respectfully submitted,

10                                              /s/ Preston Patton
                                              Preston Patton
11                                             Special Agent
                                              FBI

13  Subscribed and sworn to me via telephone:      March 14, 2025

15  The Honorable Jeremy D. Peterson
16  UNITED STATES MAGISTRATE JUDGE

19
20  Approved as to form by
   AUSA JAMES R. CONOLLY

## ATTACHMENT A

The property to be searched includes the following electronic devices (the "**Devices**"): (1) Samsung SM-A156U telephone with clear case, IMEI: 359606631233674; (2) Samsung SM-A146U telephone with black case, IMEI: 359136791172082; (3) Samsung SM-A125U telephone, with red case, IMEI: 350593474066784; and (4) Samsung SM-6531H telephone with orange case, IMEI: 352552/07/274153/5.

The **Devices** are currently located at FBI Sacramento Office Evidence Room, Roseville, California.

This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the **Devices** described in Attachment A that relate to violations of 21 U.S.C.

§ 841(a)(1), Distribution of Cocaine, which involve **Guzman** since May 1, 2024, including:

a.  text messages, pictures, or other communications related to narcotics and firearm purchases and/or sales, ammunition purchases and/or sales, and/or the possession of firearms and/or ammunition

b.  location data either stored as GPS locations, cellular tower connection data, metadata in photographs, social networking posts, wi-fi logs, and data associated with installed applications.

c.  all telephone numbers or identities assigned to the **Devices**, including the Electronic Serial Number (ESN) and the International Mobile Subscriber Identity number (IMSI) relating to the cellular telephone;

d.  call history information, including dates, times, and duration of telephone calls, as well as the contact information related to those calls;

e.  telephone book or list of contacts;

f.  Photographs and/or videos, in particular photographs and/or videos of narcotics, firearms, and or ammunition.

g.  lists of customers and related identifying information;

h.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

i.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

j.  any information recording **Guzman's** schedule or travel from **May 1, 2024**, to the present;

k.  all bank records, checks, credit card bills, account information, and other financial records.

2.    Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.    Records evidencing the use of the Internet Protocol address, including:

a.  records of Internet Protocol addresses used;

    b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant permits the examination of the **Devices** and may require authorities to employ techniques, including but not limited to the use of forensic tools for cell phones, computer-assisted scans of the entire medium, imaging and analysis, or human inspection in order to identify the items listed herein. Should the **Devices** be password protected, it may take several weeks to complete the search.

The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  The agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>(1) Samsung SM-A156U telephone with clear case, IMEI: 359606631233674; (2) Samsung SM-A146U telephone with black case, IMEI: 359136791172082; (3) Samsung SM-A125U telephone, with red case, IMEI: 350593474066784; and (4) Samsung SM-6531H telephone with orange case, IMEI: 352552/07/274153/5, CURRENTLY LOCATED AT FBI Sacramento Office Evidence Room, Roseville, California | )<br>)<br>)    Case No.    2:25-sw-0235 JDP<br>)<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 28, 2025 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _30_ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    March 14, 2025 at 3:19 p.m.    _____
*Judge's signature*

City and state:    Sacramento, California    Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

| | |
|---|---|
| _____ | |
| Signature of Judge | Date |

## ATTACHMENT A

The property to be searched includes the following electronic devices (the "**Devices**"): (1) Samsung SM-A156U telephone with clear case, IMEI: 359606631233674; (2) Samsung SM-A146U telephone with black case, IMEI: 359136791172082; (3) Samsung SM-A125U telephone, with red case, IMEI: 350593474066784; and (4) Samsung SM-6531H telephone with orange case, IMEI: 352552/07/274153/5.

The **Devices** are currently located at FBI Sacramento Office Evidence Room, Roseville, California.

This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the **Devices** described in Attachment A that relate to violations of 21 U.S.C.

§ 841(a)(1), Distribution of Cocaine, which involve **Guzman** since May 1, 2024, including:

a.   text messages, pictures, or other communications related to narcotics and firearm purchases and/or sales, ammunition purchases and/or sales, and/or the possession of firearms and/or ammunition

b.   location data either stored as GPS locations, cellular tower connection data, metadata in photographs, social networking posts, wi-fi logs, and data associated with installed applications.

c.   all telephone numbers or identities assigned to the **Devices**, including the Electronic Serial Number (ESN) and the International Mobile Subscriber Identity number (IMSI) relating to the cellular telephone;

d.   call history information, including dates, times, and duration of telephone calls, as well as the contact information related to those calls;

e.   telephone book or list of contacts;

f.   Photographs and/or videos, in particular photographs and/or videos of narcotics, firearms, and or ammunition.

g.   lists of customers and related identifying information;

h.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

i.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

j.   any information recording **Guzman's** schedule or travel from **May 1, 2024**, to the present;

k.   all bank records, checks, credit card bills, account information, and other financial records.

2.       Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.       Records evidencing the use of the Internet Protocol address, including:

a.   records of Internet Protocol addresses used;

    b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant permits the examination of the **Devices** and may require authorities to employ techniques, including but not limited to the use of forensic tools for cell phones, computer-assisted scans of the entire medium, imaging and analysis, or human inspection in order to identify the items listed herein. Should the **Devices** be password protected, it may take several weeks to complete the search.

The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  The agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.